**HANKAMER v. ROBERTS UNDERTAK-
ING CO. et al.**

**No. 3653.**

Court of Civil Appeals of Texas. Beaumont.
April 19, 1940.

Rehearing Denied May 1, 1940.

Grogan & Collins, of Liberty, and Wil-
liams, Lee, Sears & Kennerly, and W. H.
Blades, all of Houston, for appellant.

Wood, Morrow, Gresham & McCorquo-
dale, of Houston, P. C. Matthews, of Lib-
erty, and A. C. Wood, and Walter E. Boyd,
both of Houston, for appellees.

WALKER, Chief Justice.

On the 6th day of September, 1938, about
2 P. M., appellant, Ira A. Hankamer, was
injured and his wife was killed in a colli-
sion on the edge of, but not within, the
town of Devers, in Liberty county, between
the Ford pickup truck he was driving and
an ambulance, owned and operated by ap-
pellee Roberts Undertaking Company, and
driven at the time of the collision by ap-
pellee J. M. Sharp. This suit was brought
by appellant against appellees for his dam-
ages proximately resulting from the colli-
sion. Judgment was for appellees on the
verdict of the jury, finding that the colli-
sion was an "unavoidable accident"—the
only question answered by the jury of the
many questions submitted by the court's
charge. From the judgment entered
against him on the verdict of the jury, ap-

pellant has prosecuted his appeal to this court.

Appellant insists that the evidence was insufficient to raise the issue of unavoidable accident. On this issue, the evidence was as follows (Q. and A. reduced to narrative):

Mr. J. W. Metcalf testified as follows: "The accident happened on the west side of Devers on the Houston-Beaumont Highway, which, at that point, runs east and west. The accident happened on the outskirts, the edge of the town."

Appellant, Ira A. Hankamer, testified:

"This is how the accident occurred. I was driving into Devers from Anahuac, on the Anahuac road. As I got to the junction of the road—the junction of the Anahuac road and the Houston-Beaumont road it started to rain. It was raining pretty hard and I pulled off the side of the road; wouldn't go on Highway 90 (Houston-Beaumont highway) because it rained so hard, and the rain hit me in the face. I was driving a Ford pickup. When I left the intersection of the two roads, I drove on the Houston-Beaumont road and stopped to wait for the rain to slack up— I drove down the shoulder of the road. I don't know exactly how far I drove down the shoulder of the road, say seventy-five or a hundred feet. When I first came to the main highway I didn't attempt to drive on it; it was raining so hard I decided to wait until the rain slacked up, and then attempt it; it was raining so hard I was afraid I might get in the way of some vehicle. Later the rain stopped, and then I attempted to get on the Houston-Beaumont road. I was driving east in the direction of the highway. I got my front wheels on the highway and my hind wheels struck it —couldn't hop up and I stopped and waited until the rain would slack up a little bit. In fact, I stopped and I was hit just about five or six seconds after I hit the highway, I don't think I had gotten either of the back wheels on the highway. It started to rain just about the time I got to the intersection of the two roads; it had not been raining on me before that time. After I reached the highway I got off on the shoulder and sat there and it rained about twenty minutes pretty hard. From the time I stopped my car up till the time of the accident I never did stop my engine. When the rain slacked, I went to go on the highway. I started up my motor and tried to go on to Highway No. 90. At the time I started to go on to Highway No. 90 the rain had slacked up quite a bit; you could see pretty plain all the way around. The rain, the first squall, hit me with an awful hard downpour. I saw the ambulance as soon as I got on Highway No. 90; I saw it coming about a hundred feet down the road. When I saw it it was straddling the black line; the black line in the middle of the concrete on Highway No. 90, a little more on the south side of the black line than on the north when I saw it. The accident happened so quick you couldn't—the ambulance looked to me like it didn't change its course; it happened so quick you couldn't tell; it came up and struck my car. At that time the front part of my car was on the concrete, but I don't think either of the back wheels was on the concrete. I wasn't trying to get on the concrete. No, sir; when I rolled up there and saw I couldn't make it, of course, I saw the ambulance coming and before you could have time to back up or do anything he hit me. I was kind of stuck there, stopped there. I stopped because I was afraid I might jump over the black line. I saw the ambulance about the time I stopped. Only one of my wheels could have been on the concrete quite a while. My wheels didn't get stuck as soon as I hit the pavement; no, sir, I think I slid a little ways, but not far; I think about the length of the truck trying to go up. When I seen I wasn't going to make it, I threw on my brakes and quit trying. My right front wheel was about one foot off the edge of the pavement, and I was going up the concrete about a car's length that way. My left wheel was up against the pavement, and threw my right wheel out further from the pavement.

"Q. That is what I meant to say, whether I said it or not, Mr. Hankamer. And what is your recollection with reference to whether or not you did or did not move your truck from the time you saw this ambulance coming until the collision or impact? A. Well, it is hard to tell, but it was not but a very short time.

"Q. Well, I say, what is your recollection as to whether you did or did not move your truck? A. I couldn't move it very well; I was stuck.

"Q. Well, couldn't you have turned it to the right and thrown it back over the right shoulder where you said you had been? A. I might have got it back there, but I didn't try it then because I didn't have time.

"Q. You didn't have time? A. No, sir.

"Q. And these V-8's have a good deal of power don't they? A. Yes, sir. My car was in gear at the time of the collision. I had my foot on the clutch and brake and the motor was running. The collision occurred about fifty or seventy-five yards maybe a hundred feet from the intersection of the two roads down toward Devers."

Appellee Sharp testified: "This is how the accident happened. Well, as I saw the car, it looked to me like it was making a turn, coming off of a side road onto the highway. As I kept coming, it looked like it had two wheels on the highway and two off the highway. The two left hand wheels were on the highway; the left hand front wheel and the left hand back wheel; making a sloping turn coming on; just as I got, well, within ten feet of it it made a lunge out on the highway and ran right into me. It made a lunge and came on my side of the road when I was within about twenty feet of it, and the cars came together. When the car lunged towards me, I didn't have time to do much of anything; I think I tried to dodge him by turning to the left; at that time he was headed out across the road. Yes, sir; he was coming across the road into me and I thought I could cut back of him and he would go on across the road and I would miss him, and I don't know whether I turned my car or not. When I was within about twenty feet of him it looked like he tried to get all of his wheels up on the road and he got around and his back wheels caught and it just jumped across the road. He turned his car to the left and north trying to get on the road. The truck had started north across the road at the time the ambulance struck it; the truck had passed over the center line."

Mr. Lowell Smith testified: "When I drove up right after the accident this boy (referring to appellee Sharp) said, 'Take me to the doctor and get help. Did you see him dart in front of me?'"

Mr. Ray Baldwin testified: "When I got almost up on him (referring to appellee Sharp), the first thing he said to me, I believe he said, 'Did you see that fellow run into me?'"

Mr. Lowe testified: "Mr. Sharp called me from Devers; told me he had a wreck, a pickup truck ran out on the road ahead of him, and he wanted me to go down and check the wreck."

The concrete, at the point of collision, was about four or five inches above the shoulder of the road.

The issue of "unavoidable accident" was raised by the evidence on two theories of the law.

First: Under the evidence the jury could have found that appellant had not committed any act of negligence proximately causing the collision, and the same jury could have found that appellee Sharp, the driver of the ambulance, had not committed any act of negligence proximately causing the collision. The theory of our law, as now developed, seems to be that "unavoidable accident" is in every collision case where, on the evidence, the jury can return a verdict freeing both parties to the collision of negligence proximately causing the accident. We believe that Judge Funderburk, in his note to Independent Eastern Torpedo Co. v. Carter, Tex. Civ.App., 131 S.W.2d 125, 128, states the correct proposition: "In all cases wherein there are controverted issues of fact, of defendant's negligence as proximate cause of an injury and of plaintiff's negligence as proximate cause of the injury, the issue of unavoidable accident also necessarily arises as an issue of fact."

Second: Appellant contends that unavoidable accident is not in a case, unless something intervenes in addition to the negligence of the two parties to the collision. If that be the law, the evidence raised that issue. The sudden rain, the fact that appellant's car was stalled, the elevation of the concrete above the shoulder of the road, the sudden gripping of the concrete by the rear wheel of appellant's car, his loss of control of his car, the fact that, without negligence on his part, his car "jumped" ahead of the ambulance (all issues raised by the evidence) raised the issue that the accident resulted proximately from facts and circumstances, independent of any negligence on the part of either party.

Appellant's authorities are not in point. In Dallas Ry. Co. v. Darden, 38 S.W.2d 777, 779, the Commission of Appeals said: "There was no support in the evidence for the conclusion that the collision occurred without fault of either party." In Red Arrow Freight Lines Inc. v. Smith and Wife, Tex.Civ.App., 93 S.W.2d 495, 499, the court said: "While the driver of the truck had the right, under ordinary circumstances, to

drive on the highway at the rate of 25 miles per hour, we think, under the undisputed circumstances, there could be no question but that he should have checked up his speed to a much less speed than he said he was going at the time of the accident. We think the accident should not be classed as unavoidable." In Younger Bros. v. Power, Tex.Civ.App., 118 S.W.2d 954, 958, the court said: "Each driver as originally found, and as is now confirmed from a re-examination of the whole body of the testimony, claimed that he was on the right-hand side, and that the other was on the left-hand side, and stuck to it throughout the trial before the jury, thus raising that as the clear-cut and controlling fact-issue in the case; wherefore, such being the uncontroverted facts asserted on both sides, there could not at the same time, in utter contradiction on the only evidence there was, have been presented 'a theory under which the accident could have happened, notwithstanding all the parties to the transaction exercised the degree of care required by law.'" All authorities cited by appellant, as we construe them, on their facts show, as a matter of law, that the collision in issue resulted from the negligence of one or the other of the parties. In the case at bar the evidence clearly raised the issue that the collision proximately resulted from causes not chargeable to the negligence of either party.

■ Appellees were not "estopped from contending" that the collision was the result of an unavoidable accident, by reason of the fact that they filed a cross action against appellant alleging that the collision proximately resulted from specific acts of negligence committed by him.

■ The following argument by appellees' counsel did not constitute harmful error: "Now, gentlemen, my time has got over, but I want to say this to you. I can't help but believe while one of you gentlemen was coming to this court house today, if you had been driving on a road like that, a concrete road, and you had an experience where some one, not Mr. Hankamer, ran across to your side of the road, as Sharp, and as we contend Mr. Hankamer did in this case, and you jumped out and ran to the telephone, although crippled, although half 'out', and called the officers to come and make an investigation as to how this thing happened, and the officer, Mr. Pat Lowe, came on the ground—I am talking about you, now—and the sheriff had got out there and made the investigation that Pat Lowe made; and the highway officer appeared on the scene, as the proof shows he appeared in this case, and investigated your case, and some real witnesses some five hundred (500) feet away, raining hard, testified, as these witnesses did in this case; and, too, when the officers got out there, one of you gentlemen—now, the cars placed just as the cars placed in this accident—and the jury would have gone out and held you responsible for it—I mean, that is Sharp, now. That actually happened as applied to you—all you know, you was on your side of the road and you furnished these facts—you would almost lose confidence with the jury system. If it was a fact—now." In his argument, counsel stayed within the record, and what he said to the jury did not constitute an appeal to their prejudice, passion, or sympathy. The argument has support in the following authorities: Rio Grande, E. P. & S. F. R. Co. v. Dupree, Tex.Com.App., 55 S W.2d 522, 526; T. & N. O. R. Co. v. McGinnis, 130 Tex. 338, 109 S.W.2d 160; T. & P. Ry. Co. v. Short, Tex.Civ.App. 62 S.W.2d 995; Ochoa v. Winerich Motor Sales Co., 127 Tex. 542, 94 S.W.2d 416; Southwestern Gas & Elec. Co. v. Hutchins, Tex.Civ.App. 68 S.W.2d 1085; A. B. C. Storage & Moving Co., Inc., v. Herron, Tex.Civ.App., 138 S.W.2d 211.

■ The case was submitted to the jury on forty special issues. Certain of these issues submitted the negligence plead by appellant against appellees, and certain other issues submitted the contributory negligence plead by appellees against appellant. One question submitted the issue of unavoidable accident, which was the only issue answered by the jury. Appellant contends that, since the jury answered only one question, the court committed error in receiving the verdict without requiring the jury to answer the other issues. The facts deny that contention. After the jury retired to consider its verdict it sent to the trial judge the following communication: "Do we have to answer all issues in this case?" This communication was signed "F. S. Spear, Foreman." Immediately under the signature of the foreman was written: "We have reach a verdict on one of the issues." When this communication was received by the trial judge, two of appellant's counsel were present and read it; no one was present representing appellees.

Judge Coe, the trial judge, testified on motion for new trial as follows:

"Well, it was sometime along, it must have been nearly ten o'clock at night. The Sheriff informed me the jury wanted to communicate with the Court, or he either brought to me a communication, I don't recollect just which. This is the communication they brought to me from the jury. (Exhibiting a picture.)

"I was in the District Clerk's office at the time, and Mr. Grogan and Mr. Collins were there, and I believe Earney Picket, but I am not sure whether he was there or not. We three were in there. I simply remarked to Mr. Grogan that my guess, after reading this note (indicating paper in hand) that the jury had found it to be an unavoidable accident, and asked him what he thought about it and he said, well, it looked like maybe that was about what happened. Of course, none of us knew, and I remarked, well, if they have found it was an unavoidable accident it looked like that would be a verdict, and he said, it looks like that would be the end of the row, or something like that. That it would blow up the lawsuit. So I told the Sheriff to tell the jury to bring into Court the answers they had agreed upon, and I would examine it and see whether or not it was a verdict, and they brought it in.

"It was passed to me and I examined it and exhibited it to Mr. Grogan and Mr. Collins—both were in there, I think. I said boys, it looks like a verdict to me, what do you think about it? I don't know what was said (indicating they agreed with me) and I received it.

"Q. (By Mr. Wood) Mr. Grogan and Mr. Collins of counsel for the plaintiff were there. A. Yes, sir.

"Q. There was no one there representing the defendants? A. I tried to locate Mr. Matthews, but the Sheriff reported he could not find him.

"Q. Both of those attorneys took part in the trial of the case? A. Yes, sir.

"Q. Both were here throughout the trial? A. Yes, sir.

"Mr. Wood: That is all.

"Cross-examination

"Questions by Mr. Blades:

"Q. Read the statement into the record, please sir. A. (Reading from paper) 'Do we have to answer all issues in this case?' Signed 'F. S. Spear, foreman.' And imme-

diately under the signature, 'We have reach a verdict on one of the issues.'

Mr. Horace Grogan, one of the attorneys for appellant, on motion for new trial testified as follows:

"I will agree with the Court, Judge Coe, what he said as to what happened when the note was delivered in the District Clerk's office, and it was read. In addition thereto I asked the Court the question, if he thought the jury had found negligence on the part of either one of the parties, and then found unavoidable accident, if he thought it would be a verdict, and he said he didn't think he could enter a judgment on the verdict of unavoidable accident if either one of them was given by the jury in their answer. He then told Mr. Holbrook to go and get the jury and bring them in and he would look at the verdict and, as I recall it, the verdict of the jury was handed to the Court. I don't know whether by the Clerk, or by whom, but it was put in his hand and he looked at it, and the Court remarked, this looks like a verdict, I can receive this verdict, as I recall it. I was present at the time and Mr. Collins was present at the time. I don't know whether or not I saw the verdict, but I heard the verdict read. And I did not make any objection to the Court receiving the verdict, nor did I question same in any way.

"Mr. Wood: You knew, Mr. Grogan, what the verdict was, whether or not you actually looked at it or not? A. Yes, sir.

"Q. I asked if you knew? A. No, I couldn't have sworn to it, but I had an idea what it was.

"Q. Did the Court when he had it there hand it to you or not? Did he tell you what the report was? A. The Court read the answer.

"Q. I am talking about before it was read, Mr. Grogan? A. Before the answer was read?

"Q. Yes, sir; to the jury, before the Clerk read the answer out. A. I don't know the Clerk was there. I wouldn't swear the Clerk was here.

"Q. Before the verdict was read aloud you knew what that verdict was, either by reading the answer of the jury, or by what the Court said? A. By what the Court said, yes.

"Q. You knew they had found it was an unavoidable accident? A. Yes, sir; that is correct.

"Q. And you say you made no request to the Court to send them back and have them answer the rest of the questions? A. No, sir; I did not.

"Q. You thought it was a verdict? A. I certainly did."

On the statements made by the judge and Mr. Grogan, clearly appellant waived his right to insist that the jury answer the other questions submitted by the charge.

Appellees submit six other counter propositions in support of the court's ruling in receiving the verdict, which we do not discuss though we believe they are sound.

The evidence was conflicting on the issue that the jury considered "who would have to pay the court costs in the case." In overruling the motion for a new trial, the court found that issue in favor of appellees.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.